GEORGE EVANS V. THE STATE.

No. 23859. Delivered January 21, 1948.

*Sam W. Davis,* of Houston, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

DAVIDSON, Judge.

The Old Main Street Road in Harris County is not a cardinal highway; it is what is sometimes referred to as a side road. It is a shell road and is of such width that only two cars could pass. On this road is situated the Hughes Riding Stable and just east of that is the Greenwood Sanitarium. George Evans and Andrew Martin, two negro boys, ages 21 and 18, respec-

tively, were employed as grooms at the Hughes Riding Stable. They lived in a small house on the premises and did their own cooking. The deceased, Bernard Hensley, was a male nurse at the sanitarium. The State's witness, Martha Hennessey, was a cook at the sanitarium.

About dusky dark on the night of January 11, 1947, the negro boys, without the knowledge of the owner of the stable, took two horses from the stable and rode them, bareback, over to the main highway to a grocery store about a mile away to purchase provisions. The horses they were riding were known at the stable for being gentle—in fact, each of the horses was regularly and customarily used for children to ride. After making the purchases, the boys started back to the stable.

About the same time, the deceased and Mrs. Hennessey left the sanitarium to walk to the main highway to take a bus to go to a show. They were walking in a westerly direction upon the left side of the road. Deceased carried a flash-light, with the light shining on the ground.

As to what happened, we quote from Mrs. Hennessey's testimony: "As we walked along, we heard the horses coming down the road. We were going toward town, going north, and the horses were coming meeting us. I heard the horses. We were walking along and I heard a racket and I said it sounded like horses to me. Then we got over to the side of the road, on the left-hand side. We got just to the edge of the road. It is a shell road, and did not have a shoulder. We got over as far as we could get on the left-hand side of the road. The horses hit us at that time, and that's the last I remember. I guess the horses hit both of us. I got a shoulder knocked out of place and a gash over my left eye, and both knees skinned. I was knocked unconscious."

She further testified: "I know there were two horses that struck us. I just saw them; and about that time, I was hit. They were going fast. The horses were running."

The exact point of the collision was fixed at some mail boxes on the side of the road about two blocks west of the stable.

As a result of this collision, the deceased, Hensley, received injuries to the head from which he died shortly thereafter.

The two Negro boys were jointly charged with negligent

homicide of the first degree (Art. 1231, P. C.)—that is, that the death of the deceased was caused by negligence in the performance of a lawful act. The act of negligence relied upon was that of "riding and permitting said horses to travel and run along the said highway at a rapid gait and so fast that the said horses could not be checked, stopped or swerved by the said defendants in time to avoid striking persons along said highway, and said defendants then and there failed to keep a proper lookout for persons who might be on said highway * * *."

The trial was joint. The State, in addition to the foregoing testimony, offered in evidence the written confession of each defendant. Each of the defendants testified upon the trial of the case.

The jury's consideration of the two confessions was limited by the trial court only as against the maker of each confession.

Without detailing, it was the contention of the defendants that they were not running the horses or running a race; that they saw no person on the road, nor did they see a flashlight; that the horses were never out of their control; and that they did not know that any person had been struck.

We quote from the testimony of the appellant, George Evans, as follows:

"Nobody indicated to me that they were on the highway. I was watching ahead, keeping my eyes on the road, but I did not see anybody. I didn't know no one was on that side. I was on the right side of the road. Andrew Martin was riding behind me. I didn't think of nobody being on that side. My horse stumbled and threw me. Nobody screamed or yelled. No one gave any outcry or notice to me before that time. After the horse stumbled, I went on up further about a half block and fell off. I went out in the ditch. After the horse stumbled, he got faster. The horse started pitching and went on up to the barn, and I went off in the ditch. * * * the place in the road where I fell off of the horse * * * to the mail boxes * was thirty steps. * * * The horse stumbled before it started pitching, and that was the time when I struck something. * * * My horse went faster after it hit something than it went before. It was the change in speed and the pitching that caused me to fall off."

It appears that when the jury retired to consider their verdict, the trial court instructed them that in the event they ar-

rived at a verdict, they were to place it in a sealed envelope, deliver it to the clerk, and return to court the following morning, at which time the verdict would be opened and delivered to the court. This was done. The jury delivered its sealed verdict to the clerk. The next morning the verdict was opened in the presence of the jurors, and it showed that the jury had found Andrew Martin not guilty and had found George Evans guilty. The jury had not, however, fixed punishment.

Thereupon, the trial court received the verdict in so far as it related to Andrew Martin, and instructed the jury that it was necessary that they fix the punishment to be assessed against George Evans.

The jury retired, fixing the punishment of George Evans at confinement in jail for one year. From that judgment, George Evans has appealed.

It is insisted that the jury received other and new testimony during their deliberations in arriving at the penalty fixed. As to this, the record shows:

The jurors were seated in the court room waiting for the opening of the sealed verdict. The juror Byrne testified:

"While I was sitting there in the front row, I heard somebody say in a low tone of voice, "That nigger has been guilty before.' I didn't pay much attention to it. I thought the trial was over; but when I went back to the Jury room, I brought up—I suggested ninety days and they said they ought to give him a year. I lost all interest in it because I thought it referred to that remark, possibly referring to Evans, because that is the only nigger I had on my mind at that time. I agreed to a year sentence when I had previously agreed to a limited sentence because, that nigger being in trouble before, I just thought 'what's the use?' I just come to an opinion there wasn't much use putting up a fight for him; wasn't much use fighting for him if he had been in trouble before. I believe what I heard said by some one back of me who said in a low tone of voice, 'that nigger has been in trouble before.' I thought the defendant had been in some jam, or something like that. I was the only one holding out for less than a year. The remark that I overheard about that nigger in trouble before influenced me in arriving at my sentence."

Upon the trial of the case, appellant had placed his reputation in issue as a law-abiding citizen, and witnesses attested

his good reputation in that respect. No witness testified to the contrary, or that appellant had been in any prior trouble. The appellant testified that he had not, prior to the trial, been in trouble.

The testimony of juror Byrne is susceptible of but one con-construction and that is that he accepted as true the statement he heard as relating to the appellant, and appropriated that information to appellant's injury, by agreeing to the penalty he did agree to.

By Art. 753, C. C. P., the legislature has said that a new trial shall be granted "where the jury, after having retired to deliberate upon a case, have received other testimony." This statute is a mandate from the legislature and the courts are bound thereby.

It follows that the judgment is reversed and the cause remanded.

Opinion approved by the Court.